UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 20-21885-CIV COOKE/GOODMAN

ANTONIO HERNANDEZ,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO THE DEFENDANT'S *DAUBERT* MOTION TO EXCLUDE PLAINTIFF'S EXPERT OPINION TESTIMONY**

Plaintiff hereby files this Response in Opposition to Defendant's *Daubert* Motion to Exclude the Plaintiff's Expert Opinion Testimony, and in support of the same, Plaintiff states:

I. **Introduction:**

The Plaintiff contends that the Defendant's motion is misplaced, fails to inform the Court of all the disputed facts, and does not meet the elements required to strike. Furthermore, the Plaintiff contends that as evidenced below we have met our burden and satisfied all the elements in *Daubert* with the countless articles attached that are on point for our liability and causation opinions. This is a <u>not</u> a case that involves issues of highly technical science, or a case that requires an expert to review 7,000+ documents. This is a very straightforward case in which a man stepped on a nail and developed an acute infection of his skin and then lost his leg due to a six day delay.  There are hundreds of articles and reference publications regarding: (1) hospitalization of diabetic patients with Cellulitis, (2) what the proper antibiotic coverage is, and (3) what is commonly done to prevent Osteomyelitis and a leg amputation, including but not limited to an immediate ER

referral.[1] Wherefore, Defendant's motion should be denied <u>with</u> prejudice based on the below facts, referenced articles, and controlling case law.

## II. Brief Factual Background:

The negligence in this case surrounds one single outpatient visit at CHI clinic. **[Ex. 10]** Our allegations of negligence have been addressed by peer review articles for decades. These allegations are supported by sworn testimony from our local board certified internal medicine expert Dr. Kevin Inwood and his rule 26 report. **[Exs. 11 & 12]** Moreover, our allegations regarding liability and causation are supported by peer review articles/reference publications and the Homestead medical records. This is a case of acute Cellulitis and how the outpatient medical community commonly treats this common infection in order to avoid a leg/foot amputation due to an infection that reaches the bone. This issue is seen by medical doctors on the daily.

The Defendants filed a *Daubert* motion trying to engineer an issue that Dr. Inwood did not review the important and relevant documents. This is a giant red herring. The only ripe issue at bar that has any degree of merit to discuss is the following: **If CHI acted appropriately and sent Mr. Hernandez to the ER on January 15, 2019, which was six days before he presented, more likely than not, would have those six days of inpatient care saved his leg?**

We assert that the medicine and the overwhelming articles and reference publications supports, more likely than not, that the answer is a clear yes. This is not a case that involves a novel theory of medicine that has not been tested.[2] Contrary to that novel issue, this is established basic medicine in which Dr. Inwood went in great detail in order to assist this Court with understanding the medicine. The Defendant's motion is intended to confuse the Court regarding the relevant issues at bar. In addition, the Defendant has only portrayed their side of the disputed facts, and has not provided the entire picture. One example on how the motion is misleading is the misplaced assertion that Dr. Inwood was not aware of a possible delay on the Plaintiff before arriving to the clinic on <u>January 15, 2019</u>. It should be noted, that for every single document that the Defense is trying to utilize

---

[1] The articles are attached as **[Ex. 1]** through **[Ex. 9]** and will be discussed in greater detail below.
[2] A current example is a new COVID-19 test study regarding side effects from only getting one vaccination compared to two vaccinations.

to support the incident occurred around January 8, 2019, there are two documents to say it was January 14, 2019.[3]

But most importantly, regardless if this accident occurred on January 8, or January 14, Dr. Inwood was clear as day in his deposition and in his report that he recognized the factual dispute about when the incident occurred, and took that into consideration with his opinions. So it is very misplaced to try and say he failed to review those records, and then try and cherry pick a few documents out of the 7,000 + documents that have circulated in this case to date to support their motion. Finally, it is undisputed that Dr. Inwood reviewed all the documents, depositions and medical records that were relevant to him and what he needed to form his opinions. So regardless of the way the Defendant words the motion, the main documents in order to give opinions within a reasonable degree of medical probability were reviewed.

[Ex. 11, pg. 223, line 20 to pg. 224, line 14]

> 20 Q. Okay. Doctor, I got about two minutes. I'm so
> 21 sorry. This was scheduled for two to three hours, it's
> 22 been about six, So I apologize for that, but thank you for
> 23 making the time and being here with us.
> 24 So have all your opinions today been given with
> 25 within a reasonable degree of medical probability?
>
> **1 A. Yes, sir, they have.**
>
> 2 Q. All these records that counsel started talk
> 3 about while she gave hypotheticals and issues that are not
> 4 relevant or even factual to our case --and that picked records
> that you didn't have, do any of those records have anything to
> do with your opinions on the deviations in the standard of care
> in this case?
>
> **11 A. No, they do not.**

---

[3] The attorneys that handled this case in the Workers Compensation arena actually filed a joint Pre-trial stipulation agreeing that the day of accident was on January 14, 2019, not a week before the visit. It is hard to believe a Defense attorney would stipulate to an important fact like this if it was not true. **[Ex. 13]**

3

III. **Brief Summary of the Controlling Law:**

As written by Magistrate Jonathan Goodman in *Carideo v. Whet Travel*, 2018 WL 1367444 (US SD, Miami 2018) "Daubertizing" is an informal term lawyers sometimes use when referring to efforts designed to challenge (and ultimately exclude the other side from offering expert witness opinions.) Under this framework, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

*Rule 702 provides that:*
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Fed. R. Evid. 702.*

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

The district court has "broad discretion in determining whether to admit or exclude expert testimony and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993) (internal citations omitted). Because the task of evaluating the reliability of expert testimony "is uniquely entrusted to the district court" under *Daubert*, appellate courts give district courts "considerable leeway in the execution of their *Daubert* duties." *Rink*, 400 F.3d at 1291 (internal quotations omitted).

The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir.1999).

IV. **Daubert Element 1: Qualifications: The Law and Facts.**

It is unclear if the Defendant is challenging the qualification element for Dr. Inwood. Because of this, and in an abundance of caution, we must address this element. Dr. Inwood clearly satisfies this element under the law and facts of this case.[4]

An expert needs to be **minimally qualified**, and any objections to the level of his expertise typically go to the credibility and weight of the expert's opinion, not the admissibility of it. *See Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012). The test is "whether the subject matter of the witness's proposed testimony is sufficiently within the expert's expertise." *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F. Supp. 2d 1348, 1367 (M.D. Ga. 2010) (internal citation omitted).

**A lack of formal education does not automatically preclude an expert from testifying because "experience in a field may offer another path to expert status."** *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1372 (S.D. Fla. 2005) (emphasis supplied) (citing *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004)). Indeed, the Committee Note to the 2000 Amendments of Rule 702 explains that "[n]othing in this amendment is intended to suggest that experience alone … may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702 Advisory Committee's Note, 2000 Amendment.

Rule 702 requires an expert witness to have "specialized knowledge" regarding the area of testimony. Fed. R. Evid. 702(a). **As noted, the basis of this specialized knowledge "can be practical experience as well as academic training and credentials**." *Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990) (internal citation omitted); *Hammond v. Int'l Harvester Co.*, 691 F.2d 646, 653 (3d Cir. 1982) ("under Rule 702, an individual need possess no special academic credentials to serve as an expert witness.... (P)ractical experience as well as academic training and credentials may be the basis of qualification

---

[4] The Defendant is claiming that Dr. Inwood fails to satisfy element one of *Daubert*, but at the same time, they retained a semi-retired 75 year old pediatrician from New Mexico that who has not had had a private clinical practice since 2002, has not treated an adult like Mr. Hernandez for a condition like this since 2004 and does not actively supervise mid-level practitioners in a clinical setting. **[Ex. 14].**

5

(as an expert witness).") (internal quotation omitted); see also *Galarza v. Carnival Corp.*, No. 15-24380, 2016 WL 7507883, at *1 (S.D. Fla. Aug. 8, 2016) ("experts may be qualified in various ways," such as "scientific training or education" and "experience in a field").

**Courts have liberally interpreted the specialized knowledge requirement, and have stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts**." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994); see also *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quoting *In re Paoli R. R Yard*, 35 F.3d at 741 for this proposition).

**Given this flexibility, a witness "who possesses general knowledge of a subject may qualify as an expert despite lacking specialized training or experience, so long as his testimony would likely assist a trier of fact."** *Whelan v. Royal Caribbean Cruises, Ltd.,* 976 F. Supp. 2d 1328, 1331 (S.D. Fla. 2013) (emphasis added) (rejecting challenges to pulmonologist and hematologist in wrongful death action against cruise ship company) (internal citation omitted); see generally *Maiz v. Virani,* 253 F.3d 641, 665 (11th Cir. 2001) (rejecting *Daubert* challenge to economist in civil RICO case involving fraudulent real estate transactions even though the economist had no real estate development experience).

i.      *Element 1: Dr. Inwood Clearly Meets the Burden for Qualifications.*

In this case it is undisputed that Dr. Inwood went to medical school, obtained an accredited internship and internal medicine residency, is board certified in Internal medicine, is licensed to practice medicine in Florida, and has a current and active clinical practice in Jupiter, Florida in which he evaluates and treats adults with acute skin infections for decades. **[Ex. 11, 12 and 15]**.

Furthermore, it is undisputed that he actively supervises mid-level practitioners like Defendant ARNP Menberu in a clinical setting on the daily. Finally, because of his active clinical practice, his training, and his experience with acute skin infections, he has vast knowledge regarding infectious conditions like Cellulitis and how to treat them and how to avoid infections to the bone. In fact, he went over in pain staking detail this issue during his 224 page deposition.

Based on the undisputed facts regarding Dr. Inwood's, training, experience, and clinical experience with Cellulitis, and the controlling case law that defines the standard, Plaintiff strongly contends that we have met our burden to prove to this Court that the

6

Defense is not able to satisfy element one of this *Daubert* Challenge.

V.     **Element 2: Reliable Methodology: The Law and Facts.**

So again, we humbly contend that only issue that has any weight is: did **Dr. Inwood utilize reliable methodology in forming his ultimate opinion, which is "more likely than not, if Mr. Hernandez was sent to the ER as testified to by the ARNP on January 15, 2019, would he have his leg?**

Everything else is fluff and not the issue. Again, Dr. Inwood clearly touched all the elements and basis for this. In an effort to mucky the waters, the Defendant took an almost six hour 225 page marathon deposition to try and get any sound bites they can attach to this motion. The vast majority of those questions were based on non-relevant hypothetical's or made up facts that have nothing to do with our case. Fact of the matter is, Dr. Inwood's opinions are clear, concise and reliable, and satisfies the required criteria listed below.

Reliability of the methodology, [is] a separate factor, require[ing] "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method employed has a known rate of error; and (4) whether the technique is generally accepted in the scientific community. *Quiet Tech. DC-8,* 326 F.3d at 1341 (internal citation omitted).

To be sure, the thoroughness of an expert's investigation may play a role in determining if the opinion's methodology is reliable; however, the Court does not make this judgment in a vacuum. Expert testimony is admissible "if it concerns matters that are beyond the understanding of the average lay person." *Whelan*, 976 F. Supp. 2d at 1332 (internal quotation omitted). Expert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding that jurors are able to comprehend for themselves. *Id.* (internal quotation omitted). Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005).

The party proffering the expert has the burden of "laying the proper foundation for

7

the admission of the expert testimony ... and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) Expert testimony must be "based on sufficient facts or data" to be admissible. Fed. R. Evid. 702. The facts or data must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. Because experts can "opine about a complicated matter without any firsthand knowledge of the facts in the case," the trial court's gatekeeping role is "especially significant." *Frazier*, 387 F.3d at 1260; *see also Daubert*, 509 U.S. at 592 (finding that expert's "wide latitude to offer opinions" is "premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.").

Nevertheless, mistakes, defects, omissions, problems, and weaknesses with an expert's opinion do not necessarily mean that it must be *excluded.* To the contrary, many challenges to expert testimony ultimately can be viewed as an attack on the *weight* of the expert's opinions, which can be addressed at trial through vigorous cross-examination. *Holiday Inns, Inc. v. Holiday Out in Am.*, 481 F.2d 445, 447 (5th Cir. 1973) ("format of the questions and the manner of conducting the survey" go to "the weight of [the] evidence"); *see Pods Enters., Inc. v. U-Haul Int'l, Inc.*, 12-01479, 2014 WL 2625297, at **2-3 (M.D. Fla. June 12, 2014) ("improper universe" and "improper questioning" were "technical deficiencies" that "go to the weight of [the] opinions, not their admissibility"); *Hoff v. Steiner Transocean, Ltd.,* No. 12-22329, 2014 WL 273075, at *4 (S.D. Fla. Jan. 24, 2014) ("As long as a reliable basis exists for the expert's opinion, it is admissible, and it is then up to the parties to vet the opinion before the jury."); *Nightlight Sys., Inc. v. Nitelites Franchise Sys., Inc.*, No. 1:04–CV–2112–CAP, 2007 WL 4563873, at *7-8 (N.D. Ga. July 17, 2007) (finding allegedly flawed survey universe and question formats were technical deficiencies of weight, not admissibility).

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8,* 326 F.3d at 1341; *Maiz,* 253 F.3d at 666 ("A district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.' ") (quoting *Allison.,* 184 F.3d at 1311). Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink,* 400 F.3d at 1293 n.7. To the contrary, "vigorous cross-examination,

8

presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC–8,* 326 F.3d at 1341 (quoting *Daubert,* 509 U.S. at 596).

      *i.*     *Dr. Inwood: Liability Methodology: Tested, Proven and Generally Accepted.*

The methodology of Dr. Inwood's opinions can 100% be tested and is well recognized in our medical community. His liability opinions (*and causation opinions for that matter which are discussed in detail below*) are clear and concise. **The gravamen of his clear opinions is that more likely than not and within a reasonable degree of medical probability CHI deviated the standard or care in the bullet points below, and that the deviations created a six day delay which caused or substantially contributed to Mr. Hernandez having to undergo a leg amputation.**

1. Failure to appreciate the significance of his acute infection;
2. Failure to order a plain film to rule out any foreign bodies or Osteomyelitis;
3. Failure to obtain STAT blood work;
4. Failure to order the proper antibiotics; and
5. Most importantly, failure to review the abnormal A1C test result and then refer Mr. Hernandez to an emergency room that day.

He generated a very detailed report in full compliance with Rule 26, and sat from 1:30 PM to 7:11 PM for a 225 page marathon deposition. There is absolutely no hiding of the ball here, there is no confusion with his clear opinions and there are certainly no surprises about his opinions. The major opinion regarding the liability is derived and supported by a clear undisputed concession from Defendant ARNP Menberu and peer review articles.

      *ii.*     *Undisputed Damaging Smoking Gun testimony:*

This damaging concession surrounds the issue regarding if Mr. Hernandez should have been sent to an ER on January 15, 2019. All Dr. Inwood needed to review in order to form this liability opinion were the CHI records **[Ex. 10]** and the deposition of Dr. Menberu. **[Ex. 16]** He already had a vast understanding through his training/experience/knowledge dealing with this common infection and from articles and reference guides regarding how

to treat Cellulitis, and the urgency behind Cellulitis when dealing with a diabetic. Mr. Menberu admitted in his deposition that he did not review the A1C, and if he did, he would have sent Mr. Hernandez to the ER immediately.

[Ex. 16].Page 47 Lines 17-25:
>17 Q. So, it's your testimony that you didn't
>18 know he had an a1c of 6.6. Right?
>19 **A. I don't remember seeing that result, yes.**
>20 Q. If you saw that what would you have done
>21 that day?
>22 **A. Well, basically, it's the first time I**
>23 **see it was a 6.C -- 6.6. He's not taking any**
>24 **medication. I would advise him that he is -- with**
>25 **one reading of 6.6 he's diabetic, and probably**

Page 48 Lines 1-11:
>1 **since it's a high risk of being a diabetic,**
>2 **probably I'll send him to the emergency room.**
>3 Q. The last part I didn't catch. I heard
>4 everything you said other than the last part.
>5 **A. If I had seen that result I probably**
>6 **would have sent him to the emergency room to be**
>7 **evaluated.**
>8 Q. Right. You send him to an
>9 endocrinologist. Right?
>10 **A. No, emergency room. There's no -- to be**
>11 **seen right away.**

Page 49 Lines 2-9:
>2 Do you just tell him that or would you
>3 like write a referral for him to go to the ER or
>4 you'd just say go to the ER?
>5 **A. No, no, no, if he -- yes. Like I said,**

10

> 6 this is the first time I am seeing this patient
> 7 but if I see 6.6 I probably would refer him to go
> 8 to the emergency room.

This is an undisputed concession. Now faced with this damaging testimony, the defense is trying to twist the ARNP's clear testimony and try to convince this Court that sending him to the ER would be **"above and beyond the standard of care,"** and the ARNP only has a duty to meet the standard or care, not exceed it. This novel approach is misplaced and is an attempt to overcome damaging testimony regarding this standard of care concession made by the Defendant ARNP. Furthermore it goes directly against the grain of peer review articles that speak about this liability issue.

### iii.  *Articles Supporting Methodology of Liability Opinions.*

Below is an in depth review of these articles in order to satisfy the liability elements of *Daubert*. The Infectious Diseases Society of America (IDSA) published an article that is exactly on point for our allegations and defenses in this case. **When should hospitalization of a patient with Cellulitis be considered? [Ex. 1]**

You cannot get any more on point then this. The article clearly states that the IDSA also recommends inpatient admission for the following patients with Cellulitis. Mind you, this does not even take into consideration a diabetic patient, which you must make an immediate referral, just like ARNP Menberu testified to in his deposition. In this article, they document the key lab results that would warrant immediate inpatient admission.

> The IDSA also recommends considering inpatient admission in the presence of hypotension and/or the following laboratory findings: an elevated creatinine level; an elevated creatine phosphokinase level (2-3 times the upper limit of normal [ULN]); a CRP level >13 mg/L (123.8 mmol/L); a low serum bicarbonate level; or a marked left shift on the CBC with differential. [2]

One of Dr. Inwood's major criticisms is that CHI failed to secure blood work on a STAT basis. In fact, when the blood was finally drawn, and the results came back, Mr. Hernandez had the left shift, and had the elevated Creatinine IDSA speaks about. **[Ex. 10]**

*Diabetes Care*: **Trends in Rates of Infections Requiring Hospitalization Among Adults With Versus Without Diabetes in the U.S., 2000–2015. [Ex. 2]** This article speaks about how

11

the rate for hospitalizations for Diabetic patients with infections is almost 4 times higher than non-diabetic patients. It also speaks about the need for greater infectious mitigation management with adults with diabetes. The article goes on to specifically speak about the alarming increase in hospitalizations for skin and soft tissue infections like Cellulitis.

*IDSA:* **Increasing Incidence, Cost, and Seasonality in Patients Hospitalized for Cellulitis: [Ex. 3]** Again, another wonderful article published by the IDSA that speaks about how the hospitalization rates for Cellulitis in diabetics have increased at a huge rate. This is because the outpatient providers realize the need for ASAP inpatient treatment, and how this significantly reduces the chance for complications like Osteomyelitis and amputations.

**Diabetic foot infections (DFI): current concept review. [Ex. 4]** This is right on point about the evaluation of a diabetic foot infection (DBI), what classifies it according to the IDSA and what is the treatment. It further discusses why prompt recognition and treatment of DFI is mandatory to achieve a goal of maximal limb salvage. Again, this is exactly on point regarding the opinions rendered by Dr. Inwood.

In conclusion, not only are there countless other peer review articles regarding how to treat Cellulitis and how it is an emergent condition that requires ER attention when dealing with a diabetic, the Defendants main witness who was the one making the medical decisions that day <u>admitted</u> to the same exact standard or care about sending Mr. Hernandez to the ER and which Dr. Inwood testified to, and which these articles discuss.

*ii.     Dr. Inwood: Causation Methodology: Tested, Proven and Generally Accepted.*

Again, we will go over the countless peer review articles, and reference publications, regarding what are the outcomes of diabetic Cellulitis if left untreated and/or not treated appropriately. (i.e. leads to irreversible Osteomyelitis and amputation).

The Defense is trying to breeze over all this with a misplaced argument that Dr. Inwood cannot provide credible and reliable opinions because he did not review all 7,000 + documents that are in this case. This is a giant red hearing. The fact of the matter is all that Dr. Inwood needed to review outside of his extensive experience, training and knowledge of articles regarding Cellulitis were the few pages from the CHI clinic **[Ex.10]** and the medical records from Homestead hospital. **[Ex. 17]** Dr. Inwood testified clearly that he had what he needed in terms of production of documents to support his opinions and

assist the Court with the medicine. He did not review depositions or documents regarding the several red herring issues raised by the Defendant as those documents had zero relevancy or value in assisting him in rendering opinions that would ultimately assist this Court regarding medical opinions about acute Cellulitis.

      *iii.*      *Articles Supporting Methodology of Causation Opinions.*

A few of leading organizations that have published uncountable peer review articles relating to Cellulitis in diabetic patients and how to treat them to prevent leg amputations are below.

1. The Infectious Diseases Society of America, (IDSA).
2. The Journal of Diabetic Foot Compilations (JDFC)
3. Diabetes Care
4. The National Institute for Health and Care Excellence (NIHCE)
5. American Family Physician (AFP)
6. American Diabetes Association (ADA)

The IDSA also speaks about the inpatient management that would be provided to try and prevent a complication like Osteomyelitis and an amputation. It is undisputed that if Mr. Menberu would have reviewed the A1C test, he would have sent Mr. Hernandez to the ER. Looking at the medical records from Homestead hospital, and all the articles and publications about what care would have been given if he we referred to Homestead Hospital on January 15, 2019, it is also undisputed that he would have received the following care and treatment in a hospital setting starting six days early.

a) 24/7 close motioning of his foot.
b) STAT blood work.
c) Full imaging work up.
d) BS control with medications.
e) IV antibiotics to prevent Osteomyelitis.
f) Culturing to identify the organism.
g) Debridement's to prevent the skin infection from reaching the bone and remove dead tissue.

      h) Control of his acute renal failure.

The above facts are undisputed, and referenced below is supports the same.

*Guidelines for inpatient management.* **[Ex. 1]**

> Guidelines for the management of patients who require hospitalization for cellulitis or cutaneous abscess. AFB = acid-fast bacilli; BID = twice daily; CRP = C reactive protein; CT = computed tomography scanning; DS = double strength; DM = diabetes mellitus; ESR = erythrocyte sedimentation rate; ESRD = end-stage renal disease; HIV = human immunodeficiency virus; ICU = intensive care unit; I&D = incision and drainage; ID = infectious disease; IDU = injection drug user; IV = intravenous; LRINEC = Laboratory Risk Indicator for Necrotizing Fasciitis; MRI = magnetic resonance imaging; MSRA = methicillin-resistant Staphylococcus aureus; NSAIDS = nonsteroidal anti-inflammatory drugs; PO = by mouth; SSTI = skin and soft-tissue infections; TID = 3 times daily. Adapted from Jenkins TC, Knepper BC, Sabel AL, et al. Decreased antibiotic utilization after implementation of a guideline for inpatient cellulitis and cutaneous abscess. Arch Intern Med. 2011;171(12):1072-9.

**Diabetic Foot Infection. [Ex.5]** This article has a nice algorithm that discusses what the care and treatment is for certain DFI, and how that treatment is crucial in order to avoid an amputation.

**Variation in antibiotic treatment for diabetic patients with serious foot infections, A retrospective observation study. [Ex. 6]** This is one of the largest inpatient studies that utilized the VA diabetic database and followed the IDSA guidelines. Again, this speaks about optimal antibiotic therapy, imaging, wound management and hospitalizations to avoid major complications like an amputation.

**A new staging system for Cellulitis in diabetic lower-limbs-improving diabetic foot practice around the world.** A very detailed article published by the respected Journal of Diabetic Foot Complications. They did a wonderful job of staging diabetic Cellulitis, and what needs to be done to manage those stages to avoid amputation. It specifically discusses on page 51 "that Stage 1 DFI is medically managed by hospitalization and IV antibiotics. Mind you Stage 1 is the least aggressive stage of Cellulitis, (stage 5 is worse case) so it will be hard pressed that the Defense can argue Mr. Hernandez had a lower stage then 1.

We have other articles, **[Ex.8 and Ex. 9]** but due to the fact that this medical issue has been cemented in publications for decades, we believe we discussed more than enough information to meet our burden.

So simply stated, Dr, Inwood said, more likely than not and within a reasonable degree of probability, if CHI sent Mr. Hernandez to the ER like ARNP Menberu said he would have done, Mr. Hernandez would have started to receive all this medical management as stated above six days earlier than he did, and that management more likely then not would have prevented the foot amputation. This is supported by real life medicine, and the countless articles and reference publication about inpatient management of this exact condition. When reviewing all the evidence presented in this response, we strongly contend that it is clear that Dr. Inwood has the training and education to opine on causation, and has the proper knowledge regarding the outcome of Cellulitis in a diabetic patient, and how leg amputations can be prevented in a diabetic if one can avoid needless delay or inappropriate treatment.

## VI.   Conclusion

We strongly contend that when reviewing all the facts in this case, the sworn testimony of Dr. Inwood and the plethora of peer review articles and reference publications about liability and causation surrounding Cellulitis and amputations, the Defendant has not proven all the necessary elements to strike Dr. Inwood under *Daubert* and that we have met our burden in proving that his opinions satisfy the elements of Daubert.

WHEREFORE, we respectfully ask this Court to DENY the Defendants motion with prejudice.

Date: May 7, 2021                                    Respectfully submitted,

/s/ Christopher S. Russomanno
CHRISTOPHER S. RUSSOMANNO
RUSSOMANNO & BORRELLO, P.A.
Museum Tower – Penthouse 2800
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 373-2101
Facsimile: (305) 373-2103
Christopher S. Russomanno
Fla. Bar No. 14657
Email: chris@russomanno.com
*Counsel for Plaintiff Antonio Hernandez*

### CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2021, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on any and all counsel of record or pro se parties in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Christopher S. Russomanno